IN THE UNITED STATES DISTRICT COURT
IN THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:16-cv-1143

| | |
|---|---|
| KRYSTINN L. SYDELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| LIFEMED USA, INC., | ) |
| THE LIFEMED GROUP, INC., and | ) |
| MURRAY MAYNARD, | ) |
| in his individual capacity, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

## COMPLAINT

COMES NOW Plaintiff Krystinn L. Sydell ("Sydell"), by and through counsel, and files this Complaint against Defendants LifeMed USA, Inc. ("LifeMed USA"), The LifeMed Group, Inc. ("LifeMed Group"), and Murray Maynard ("Maynard"), in their individual capacities.

<u>PARTIES, JURISDICTION & VENUE</u>

1. Sydell is an adult citizen and resident of Orange County, Chapel Hill, North Carolina, and has been at all times relevant to this Complaint.

2. Sydell is a former employee of LifeMed, USA.

3. Upon information and belief, LifeMed USA is a Delaware corporation with its principal place of business in Ohio.

4. Upon information and belief, LifeMed Group is a Canadian corporation with its principal place of business in Ontario, Canada.

1

5. Upon information and belief, Maynard is an adult resident of Ohio.

6. At all times relevant to this action, Maynard acted as the Chief Executive Officer of LifeMed USA.

7. At all times relevant to this action, Maynard acted as President and Chief Executive Officer of LifeMed Group.

8. At all relevant times to this action, Maynard exercised control over the terms and conditions of Sydell's employment.

9. Defendants LifeMed USA, LifeMed Group and Maynard are "employers" within the meaning of N.C. Gen Stat. §95-25.2 and other relevant statutes.

10. The amount in controversy in this action exceeds $75,000.00.

11. At the time the acts complained of herein occurred, complete diversity of citizenship existed between Plaintiff Sydell and Defendants LifeMed Group, LifeMed USA and Maynard.

12. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

13. The Court has jurisdiction over each of the non-resident Defendants by virtue of each Defendant's contacts with the State of North Carolina, which include significant activities in North Carolina, or directed toward Sydell in North Carolina, from which Plaintiff's claims arise.

2

Case 1:16-cv-01143-LCB-LPA   Document 1   Filed 09/14/16   Page 2 of 15

14. Venue lies in this Court pursuant to 28 U.S.C. § 1391 as the acts and omissions giving rise to the causes of action alleged herein occurred in this District.

FACTUAL BACKGROUND

15. Sydell is a well-respected marketing, business development, and strategic planning executive in the medical devices field.

16. From 2010 until 2014, Sydell had a lucrative position with N.I. Medical, LTD, ("N.I. Medical") an Israel medical devices company specializing in a non-invasive hemodynamic monitoring device used for heart-related conditions.

17. In her role as a Regional Executive, North America with N.I. Medical, Sydell successfully marketed and sold a product known as NICaS.

18. In the summer of 2013, Sydell met Maynard, the CEO of The LifeMed Group. LifeMed Group was a client of Sydell's in her role as an employee of N.I. Medical.

19. In the fall of 2013, Maynard aggressively pursued Sydell to join him in creating a new company in the United States, LifeMed USA, that would market and sell the NICaS device in the United States.

20. Maynard promised Sydell that the new company would hire her as its key sales, marketing and clinical executive and would eventually make her an equity partner.

21. On the basis of Maynard's inducements, Sydell executed an Employment Agreement that set out the terms and conditions of her employment with LifeMed USA. See, Exhibit 1, Employment Agreement, attached hereto.

22. For her work with LifeMed USA, Maynard and LifeMed USA initially promised Sydell: i) not less than $75,000.00 in gross annual salary; ii) a guaranteed commission payment for the first 6 months of employment equal to the greater of $5,769.00 gross monthly salary or the actual commissions from sales; iii) a $500.00 monthly car allowance; iv) a $600.00 monthly stipend towards health care costs; and v) 3 weeks of paid vacation time.

23. On September 15, 2014, Sydell began work for LifeMed USA.

24. LifeMed did not pay Sydell any wages in September, 2014.

25. On October 6, 2014, Sydell received a $5,000.00 check drawn on Maynard's personal checking account without any accounting of how her salary, car benefit, health care benefit or vacation pay were calculated. The check did not indicate that any state or federal tax deductions were made from the payment. (Attached hereto as Exhibit 2).

26. Sydell had not agreed to be an independent contractor for LifeMed or to receive payment as a contractor.

27. On November 4, 2014, when no payroll monies were deposited into her account and no payroll check was issued to Sydell, she again requested that Defendants Maynard and LifeMed USA compensate her as set out in the Employment Agreement.

28. On November 10, 2014, Sydell received a check drawn from Maynard's personal checking account in the amount of $5,000.00. The check did not include a

4

pay roll stub or any other indication of Sydell's rate of pay or whether any payroll tax withholdings were made from the check.

29. For months after November 2014, Maynard randomly and intermittently paid Sydell from his personal account with no accounting of benefits or payroll taxes. During this time, Sydell regularly asked Maynard and LifeMed USA to pay her wages as promised.

30. In May 2015, Maynard and LifeMed USA engaged the accounting firm of Bober, Markey and Fedorovich ("BMF") in Akron, OH to review and reconcile Sydell's payroll.

31. On June 16, 2015, Sydell and Maynard met with the BMF accountants, Nicole Hughes ("Ms. Hughes") and Caitlin Lucas ("Ms. Lucas") to discuss monies that the Defendants owed Sydell.

32. BMF determined that LifeMed USA owed Sydell approximately $62,461.00 net in back wages and $49,819.00 (not including interest and penalties) to the state and federal tax authorities related to Sydell's pay. BMF created a spreadsheet showing: i) the amount of monthly gross income Sydell was entitled to; ii) the amount of payments LifeMed USA actually made to Sydell; iii) the employer-side tax payments that LifeMed USA needed to pay the North Carolina and U.S. governments; and iv) the total "net pay" LifeMed USA owed to Sydell.

33. BMF agreed to set up payroll processing for Sydell on behalf of LifeMed USA and Maynard.

34. Maynard agreed that for all of 2015 and going forward, Sydell's salary would be set at $150,000.00 annually. Maynard verbally approved Sydell's monthly salary that BMF calculated on the basis of a $150,000.00 annual salary.

35. Maynard pledged to make six "catch-up" payments to Sydell of approximately $10,400.00 each over a 90-day period (i.e. spread out over six pay periods) to compensate Sydell for the $62,461.00 net he owed to her in back wages.

36. In August 2015, Sydell received from BMF two payroll deposits in the net amounts of $4,906.51 and $4,815.82 (gross $6,500.00) and two "catch up" payments in the net amounts of $10,389.49 each.

37. In September 2015, Defendants Maynard and LifeMed USA correctly paid Sydell her bi-weekly gross of $6,500.00 (net $4,815.82), but did not pay her any "catch up" pay. This time Sydell reached out to both the accountants at BMF, Prime Pay (the payroll processing company) and Maynard.

38. On September 23, 2015, Ms. Hughes of BMF confirmed in an email to Sydell and Maynard, that: 1) LifeMed USA owed Sydell four additional "catch up" payments; and 2) Sydell's gross pay of $6,750.00 (reflecting inclusion of the health care benefit) would continue "as is" until Maynard notified BMF otherwise.

39. On October 2, 2015, Sydell received a direct deposit in the net amount of $4,815.82 drawn from LifeMed USA's account.

40. On October 13, 2015, Sydell received two direct deposits drawn from LifeMed USA's account in the net amount of $10,939.19 each. These deposits

6

correctly corresponded to BMF's calculation of the "catch up" pays Defendants LifeMed USA and Maynard owed to Sydell.

41. On October 15, 2015, LifeMed USA deposited to Sydell's personal checking account two "catch up" pays in the net amounts of $10,979.62 and $11,752.94 respectfully, plus one check in the amount of $11,985.40 that represented her regular payroll amount and July to September expenses.

42. On October 19, 2015, without any notice or authority, Defendants LifeMed USA and Maynard made an unauthorized cash sweep of $45,657.00 from Sydell's personal checking account back into LifeMed USA's account.

43. Maynard offered no explanation to Sydell about why he and LifeMed USA directed the bank to remove funds from her checking account.

44. Sydell asked Maynard to return the $45,657.00 to her bank account. Maynard promised Sydell that the "problem" would be fully resolved.

45. Neither LifeMed USA nor Maynard ever returned to Sydell the $45,657.00 it removed from her bank account.

46. In November 2015, Maynard admitted to Sydell that he and LifeMed USA failed to pay Sydell monies that it owed to her for her work with him and LifeMed USA.

47. In December 2015, Sydell again asked Maynard to pay her the gross $47,612.04 that Maynard admitted to owing her.

48. Sydell contacted BMF in an attempt to correct any errors in payroll processing that could be holding up her pay.

49. Upon information and belief, shortly after BMF's call with Sydell, BMF disengaged with LifeMed USA.

50. Later, Maynard chastised Sydell twice for "threatening to sue" him and BMF over her missing wages.

51. On January 28, 2016, Maynard promised to immediately pay Sydell $20,000.00 and an additional $20,000.00 shortly after that. However, Maynard demanded that Sydell submit an "activity report" before he would pay her the wages she was due.

52. Notwithstanding the slew of broken promises regarding her pay, Sydell continued to work on behalf of the Defendants.

53. On February 12, 2016, Sydell received $20,000.00 in a direct deposit from Defendant LifeMed Group.

54. LifeMed Group did not provide Sydell with any payroll stub or any other indication that appropriate payroll taxes were deducted from this deposit.

55. On Feb. 17, 2016, despite having no poor performance reviews, no prior disciplinary actions, and no notice, Maynard told Sydell that she was terminated "for cause" and advised her that a letter from his attorney was forthcoming.

56. On May 3, 2016, Sydell timely filed an Employment Discrimination Complaint with the North Carolina Department of Labor against LifeMed USA and Defendant Murray for violation of the Retaliatory Employment Discrimination Act when they terminated Sydell.

57. On September 6, 2016, a right to sue letter was issued by the North Carolina Department of Labor. (Attached hereto as Exhibit 3).

## FIRST CLAIM FOR RELIEF

### (Violation of NC Wage & Hour Act)

58. The allegations in paragraphs 1 through 58 above are hereby incorporated by reference.

59. The provisions of Article 2A of North Carolina General Statutes Chapter 95 apply to Sydell's employment with Defendants.

60. Payment for work performed by Sydell for Defendants constitute wages within the meaning of N.C. Gen. Stat. § 95-25.2(16).

61. At all relevant times, the Defendants Maynard, LifeMed USA and LifeMed Group have been Sydell's "employers" for purposes of N.C. Gen. Stat. § 95-25.2(5).

62. Defendants' failure to pay Sydell the full wages owed to her constitute a violation of N.C. Gen. Stat. § 95-25.6.

63. Pursuant to N.C. Gen. Stat. § 95-22(a), Sydell is entitled to recover, among other things, such wages that are due to her at the time of judgment, with prejudgment interest from the date they became due.

64. Pursuant to N.C. Gen. Stat. § 95-25.22(a1), Sydell is further entitled to recover liquidated damages equal to the amount of wages due to her.

65. Pursuant to N.C. Gen. Stat. § 95-25.22(d), Sydell is further entitled to recover her costs and reasonable attorneys' fees in this action.

## SECOND CLAIM FOR RELIEF

## (Violation of Retaliatory Employment Discrimination Act)

66. The allegations in paragraphs 1 through 66 are hereby incorporated by reference.

67. The provisions of Article 2A of North Carolina General Statutes Chapter 95 apply to Sydell's employment

68. Sydell engaged in conduct protected by the Retaliatory Employment Discrimination Act (hereinafter referred to as "REDA") when she complained about not being paid her wages to Mr. Murray and asked BMF accountants about her unpaid wages.

69. Defendants took adverse retaliatory employment actions against Sydell, when Mr. Maynard terminated Ms. Sydell for asking for her wages and "threatening to sue" him about her wages as alleged herein.

70. On May 3, 2016, Sydell timely filed an Employment Discrimination Complaint with the North Carolina Department of Labor.

71. A right to sue letter was issued by the North Carolina Department of Labor on September 6, 2016. This complaint was timely filed within 90 days of the right to sue letter.

72. As a direct result of Defendants' unlawful termination, Sydell incurred damages and is entitled to, among other things, injunctive relief, lost wages, lost benefits and other economic losses.

73. Sydell is entitled to treble damages in accordance with N.C. Gen. Stat. § 95-243(c)(4) based upon Defendants' willful REDA violations.

74. Sydell is entitled to his reasonable costs and expenses, including reasonable attorneys' fees, pursuant to N.C. Gen. Stat. § 95-243(c).

## THIRD CLAIM FOR RELIEF

### (Wrongful Discharge in Violation of North Carolina Public Policy)

75. The allegations in paragraphs 1 through 75 are hereby incorporated by reference.

76. It is the public policy of the State of North Carolina to ensure that employers do not retaliate against employees who engage in protected activity covered by the Retaliatory Employment Discrimination Act ("REDA"), as manifested in N.C. Gen. Stat. § 95-241 and the North Carolina Wage & Hour Act.

77. In accordance with North Carolina public policy, Sydell engaged in protected activity under REDA and the North Carolina Wage & Hour Act as alleged herein.

78. Defendants took adverse and/or retaliatory employment actions against Sydell, as alleged herein.

79. Defendants' adverse and/or retaliatory employment actions against Sydell were motivated by her protected activity, as alleged herein, and thus were a violation of the public policy of the State of North Carolina.

80. As a result of Defendants' unlawful employment actions, Sydell is entitled to back pay, punitive damages and other forms of relief.

81. The conduct, acts and omissions of Defendants constitute malicious, willful and wanton conduct or were in reckless disregard and indifference to Sydell's rights.

## FOURTH CLAIM FOR RELIEF

### (Breach of Contract and Breach of Implied Covenant of Good Faith and Fair Dealing)

82. The allegations in paragraphs 1 through 82 are hereby incorporated by reference.

83. On the basis of Maynard's promises, Sydell executed an Employment Agreement that set out the terms and conditions of her employment with LifeMed USA including her compensation for her work.

84. In executing the Employment Agreement with Sydell, the Defendants agreed to a covenant of good faith and fair dealing to abide by the terms and conditions of the Agreement.

85. The Defendants breached the contract and their covenant of good faith and fair dealing as follows:

    a. By failing and refusing to pay Sydell her rightful wages and benefits;

    b. By falsely attributing the failure to pay Sydell her wages to accounting or payroll errors;

    c. By sweeping monies from her checking account without notice and without her permission;

    d. By demanding that she provide an activity report before paying her the wages and benefits that it owed to her.

86. As a proximate result of the breach of contract and the covenant of good faith and fair dealing by the Defendants, Sydell has suffered a substantial loss of income and benefits, loss of professional reputation and other damages to be proven at trial.

## FIFTH CLAIM FOR RELIEF

**(Unjust Enrichment)**

87. The allegations in paragraphs 1 through 87 are hereby incorporated by reference.

88. Sydell applied her time, talent and resources to market and sell medical devices for her employers with the reasonable and legitimate expectation that she would be compensated, as promised, for her efforts.

89. The Defendants received and accepted the substantial benefits of Sydell's work and expenditures, as set forth above.

90. Defendants have been unjustly enriched by the value of Sydell's' work for which she did not receive the remuneration to which she is entitled.

91. Sydell is entitled to recover from Defendants, and they should be disgorged of, the full amount of their unjust enrichment attributable to her work efforts.

## SIXTH CLAIM FOR RELIEF

**(Conversion)**

92. The allegations in paragraphs 1 through 92 are hereby incorporated by reference.

93. On October 19, 2015, without any notice or authority, Defendants LifeMed USA and Maynard made an unauthorized cash sweep of $45,657.00 from Sydell's personal checking account.

94. Maynard offered no explanation to Sydell about why he and LifeMed USA directed the bank to remove funds from her checking account.

95. LifeMed USA and Maynard did wrongfully and illegally remove the funds from Sydell's personal checking account without Sydell's permission and the monies were then placed into LifeMed USA's account.

96. Neither LifeMed USA nor Maynard ever returned to Sydell the $45,657.00 it removed from her bank account.

97. Neither LifeMed USA nor Maynard had the right to take into possession the personal property of Sydell and are therefore liable to Sydell for damages for the wrongful conversion of personal property belonging to Sydell.

WHEREFORE, Sydell respectfully requests the following relief:

a. That she recovers from Defendants, jointly and severally, all wages, benefits and other compensation to which she is entitled plus interest as allowed by law and to be determined at trial;

b. That she recovers from Defendants, jointly and severally, compensatory and punitive damages plus interest as allowed by law, in an amount to be determined at trial;

c. That she recovers from Defendants, jointly and severally, the reasonable costs of attorneys' fees incurred in the prosecution of this action, plus interest as allowed by law;

d. That she recovers equitable relief as appropriate, including injunctive relief and/or reinstatement;

e. That she recovers from Defendants, jointly and severally, liquidated damages pursuant to N.C. Gen. Stat. N.C. § 95-22(a1), in an amount to be determined at trial;

f. That she recovers from Defendants, jointly and severally, treble damages pursuant to N.C. Gen. Stat. § 95-243(c);

g. That all costs of this action be taxed against Defendants, jointly and severally;

h. That all issues in this case be tried by a jury; and

i. For such other and further relief that the Court deems appropriate.

Respectfully submitted this 14th day of September, 2016.

        THE NOBLE LAW FIRM, PLLC

        /s/ Laura L. Noble
        Laura L. Noble, Esq. (NC Bar No. 38691)
        141 Providence Road, Suite 210
        Chapel Hill, NC 27514
        Telephone: (919) 251-6008
        Facsimile: (919) 724-9001
        lnoble@thenoblelaw.com